## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF IDAHO

_____

In Re:
**Elizabeth M. McDowell,**

**Debtor.**

| **Bankruptcy Case No. 10-40845-JDP** |

_____

**Elizabeth M. McDowell,**

                         **Plaintiff,**

**vs.**

**Education Credit Management Corporation, and U.S. Department of Education,**

                         **Defendants.**

**Adv. Proceeding No. 14-08005-JDP**

_____

## MEMORANDUM OF DECISION

_____

MEMORANDUM OF DECISION – 1

**Appearances:**

Stephen A. Meikle, Idaho Falls, Idaho Attorney for Plaintiff.

Thomas E. Dvorak, Givens, Pursley LLP, Boise, Idaho Attorney for Defendant Education Credit Management Corporation.

*Introduction*

In this adversary proceeding, chapter 7[1] debtor Elizabeth Margaret McDowell ("Plaintiff") asks this Court to declare that the student loan debts she owes Education Credit Management Corporation ("ECMC") and the U.S. Department of Education ("DOE") should be discharged in her bankruptcy case because the obligation to repay them will impose an undue hardship upon her.  *See* § 523(a)(8); Dkt. Nos. 1, 10.  Defendants, ECMC and DOE, contested discharge of the student loans arguing that Plaintiff can not establish undue hardship.  *See* ECMC Pretrial Br. at 2, Dkt. No. 62; DOE Pretrial Br. at 2, Dkt. No. 70.

A trial in the adversary proceeding was conducted by the Court on

---

[1]   Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, and all references to "Rules" are to the Federal Rules of Bankruptcy Procedure, 1001-9037.

MEMORANDUM OF DECISION – 2

December 3 and 4, 2015, at which the parties appeared and offered

testimony and evidence; closing arguments were to be submitted later via

briefs.  Dkt. No. 80.

Prior to the filing of the briefs, DOE and Plaintiff reached a

compromise allowing the discharge of a portion of the DOE debt; the deal

was evidenced by a stipulation as well as a consent judgment entered by

the Court.  Dkt. Nos. 81, 82.[2]

Unable to resolve their disagreement, Plaintiff and ECMC filed their

---

[2] Plaintiff's debts to DOE are for a Federal Direct Plus Loan for funds she
borrowed to pay expenses for her daughter's undergraduate education.  *See* DOE
Stipulation and Consent Judgment at 2, Dkt. No 81.  The original principal
balance was comprised of a $4,329 disbursement made in August 2009, and a
$4,238 disbursement made in January 2010, upon which interest was to accrue at
7.9% per annum.  *Id.*  As of December 21, 2015, Plaintiff owed approximately
$12,591.17 on this debt, which included unpaid principal of $8,477 and accrued
interest of approximately $4,115.17.  *Id.*

Under the stipulated judgment, Plaintiff will partially discharge this debt,
leaving her with a balance of $10,000, "which includes the original principal of
$8,477 and capitalized interest of $1,523, with an interest rate of 7.9 percent per
annum."  *Id.* at 3.  Plaintiff is obligated to make monthly payments of $94.99
commencing in March 2016, for 15 years or until the judgment debt is paid in
full.  *Id.*  The judgment also provides that Plaintiff may not participate in any
income-driven repayment plans or any other payment programs normally
available for student loans.  *Id.*

MEMORANDUM OF DECISION – 3

posttrial briefs, Dkt. Nos. 91, 94, 98, and the issues were taken under advisement.

The Court has now considered the record, evidence and testimony, the parties' arguments and briefs, as well as the applicable law.  This Memorandum sets forth the Court's findings of fact, conclusions of law, and its decision concerning the issues.  Rules 7052; 9014.

### Status of the Case

Plaintiff filed her chapter 7 petition commencing the bankruptcy case on May 14, 2010.  *In re McDowell*, No. 10-40845-JDP, Dkt. No. 1 (Bankr. D. Idaho May 14, 2010).  A discharge was entered, and the bankruptcy case was closed on September 7, 2010.  *McDowell*, Dkt. Nos. 20, 21.  Plaintiff did not seek to discharge her student loans while the case was open.

On May 24, 2013, Plaintiff filed a motion to reopen the bankruptcy case to address the student loans.  *McDowell*, Dkt. No. 25; Ex. No. 310.  On May 31, 2013, the Court granted her motion.  *McDowell*, Dkt. No. 27; Ex. No. 311.

MEMORANDUM OF DECISION – 4

On January 3, 2014, Plaintiff filed the complaint commencing this

adversary proceeding.  Dkt. No. 1.  She filed an amended complaint on

November 17, 2014.  Dkt. No. 21.  Defendants filed answers.  Dkt. Nos. 29,

30.

*Facts*[3]

**1.     The ECMC Student Loans and Plaintiff's Repayment Efforts**

As of April 2015, the balance due on Plaintiff's various student loans

still in dispute with ECMC, including accrued interest, totaled

approximately $93,000, with interest accruing at seven percent per annum.

Klisch Aff. at 3, Ex. 250.  The amounts Plaintiff originally borrowed,

roughly $56,000, financed her undergraduate and graduate college degrees

in social work, which she received from Idaho State University and Walla

Walla University in 2005 and 2006 respectively.  Ex. 220 at 2.

---

[3] Of course, the Court had the opportunity to observe the witnesses and
their demeanor while they testified at trial.  To the extent it was a factor, this
recitation of the facts reflects the Court's assessment of the credibility of the
witnesses' testimony.  And, in the case of expert testimony, these fact-findings
also reflect the Court's decisions concerning the evidentiary weight to be
afforded to the opinions expressed by those witnesses.

MEMORANDUM OF DECISION – 5

Following graduation, Plaintiff consolidated her loans in June 2007.[4] Klisch Aff. at 2, Ex. 250. From that time until her bankruptcy closed in September 2010, Plaintiff's loans were continuously in forbearance or deferment. *Id.* at 3; Ex. E to Klisch Aff. at 1, Ex. 250.

After bankruptcy, Plaintiff attempted to repay the loans through a so-called "Income Based Repayment Plan" ("IBR plan"). *See* Ex. 212 at 1. However, the IBR plan was terminated when she was granted forbearance from making payments from April 2012 until March 2013. *Id.* Following that period, Plaintiff's request for further forbearance was denied because she had exhausted the maximum forbearance allotted by her lender. Exs. 212, 214. Shortly thereafter, in April 2013, Plaintiff applied and qualified for another IBR plan, under which her monthly payments were to be $357.22. Ex. 217. The Court is unaware of the current repayment status of

---

[4] Plaintiff consolidated her loans through lender Wells Fargo with Northwest Educational Loan Association ("NELA") as the guarantor. When Plaintiff filed for bankruptcy in May 2010, the consolidated loan was transferred to NELA by operation of the loan guaranty. NELA assigns its accounts that are in dispute in bankruptcy to ECMC for servicing. Klisch Aff. at 203, Ex. 250; *see also* Ex. 221.

MEMORANDUM OF DECISION – 6

Plaintiff's loans or the IBR plan.  However, as of April 2015, ECMC

estimates that, given her total loan balance of approximately $93,000,

under a repayment plan of 30 years, with seven per cent interest per

annum, Plaintiff's monthly payment would be approximately $620.  Ex. F

to Klisch Aff. at 2, Ex. 250.

ECMC's records concerning Plaintiff's student loans reflect that

Plaintiff has paid a total of only $1,534.04 towards the debt.[5]  Klisch Aff. at

3, Ex. 250.  Not really disputing this, Plaintiff testified that she only made a

few payments because, even under the IBR plans, the monthly payments

were too high, and she could not afford them.

Plaintiff testified that she also made attempts to receive repayment

assistance through the National Health Service Corporation ("NHSC").  In

2012, she briefly left her job at Eastern Idaho Regional Medical Facility

("RMF") to work for a community agency affiliated with NHSC, but

---

[5] Aside from this aggregate amount of Plaintiff's payments, little
information regarding the timing and amounts of Plaintiff's payments was
offered by the parties.

MEMORANDUM OF DECISION – 7

Plaintiff returned to RMF after only three weeks because she was not

getting the client contact hours originally promised to her and could not

financially afford to work as little as she was.  Pl.'s Sept. 2014 Dep. at 36-

37, Dkt. No. 343.  Plaintiff testified she again attempted to receive

repayment assistance through NHSC when she began working for the

Idaho Department of Health and Welfare ("DHW") in 2013, but she

apparently was ineligible for the program because she was not current on

her loan payments.  *See also* Pl.'s Resp. to ECMC's Interrog. No. 27, Ex. 230;

Pl.'s Resp. to ECMC's Req. for Produc. No. 19, Ex. 230.

In its posttrial brief, ECMC explained that on December 17, 2015, the

DOE launched a Revised Pay As Your Earn, or REPAYE plan.  ECMC's

Posttrial Br. at 21-22, Dkt. No 94.[6]  Under this program, Plaintiff's monthly

payments would be limited to no more than 10 percent of the amount that

her adjusted gross income exceeds 150 percent of the poverty guidelines

---

[6]  The terms of this program can be found at Student Assistance General
Provisions, Federal Family Education Loan Program, and William D. Ford
Federal Direct Loan Program, 80 Fed. Reg. 67204-01, 67239 (Oct. 30, 2015) (to be
codified at 34 C.F.R. § 685.209(c)).

MEMORANDUM OF DECISION – 8

applicable to her family size for the month.[7]  80 Fed. Reg. at 67239 (to be

codified at 34 C.F.R. § 685.209(c)).  Additionally, under this program, if

Plaintiff's adjusted monthly payments are insufficient to cover the interest

that accrues each month, depending on the type of loan, she will be

charged only a portion of any interest that exceeds her payment.  *Id.* (to be

codified at 34 C.F.R. § 685.209(c)(iii).  While not reducing the principal

balance due, this feature of the program would reduce the rate at which

Plaintiff's loan balance would increase due to unpaid interest each month.

**2.      Plaintiff and Her Children**

Plaintiff is forty-three years old, single, and the mother of two

children.  She was married to her first husband, the father of her daughter,

from January 1991 until June 1997, when they divorced.  Pl.'s Resp. to

ECMC's Interrog.  No. 25, Ex. 224.  She married her second husband, the

---

[7] ECMC provided estimates of Plaintiff's monthly payments under this program, but they are likely inaccurate because they were based on a family size of three.  ECMC's Posttrial Br. at 21, Dkt. No. 94.

MEMORANDUM OF DECISION – 9

father of her son, in March 1999, and they divorced in December 2007. *Id.*

Plaintiff testified that her second husband worked while she attended

college, and that their divorce, which occurred shortly after she graduated

and began working full-time, created challenges for her and was one of the

reasons she applied for deferments on repayment of her student loans as

long as she could. *See also* Pl.'s Mar. 2015 Dep. at 44-45, Ex. 342 (*i.e.*, when

asked about her bankruptcy filing in 2010, Plaintiff responded that her

divorce was bad financially for her).

Plaintiff's fifteen-year-old son resides with her and depends upon

her for his support. When asked during her deposition if the father

contributed towards the son's support, Plaintiff responded, "we don't

have child support, but we share custody of him. So, he often helps not

with monetary expenses, but just if he needs something or he feeds him, of

course. I pay the medical insurance and take care of all his material needs,

too." Pl.'s Sept. 2014 Dep. at 79–80, Ex. 343.[8]

---

[8] This testimony may be somewhat inconsistent with Plaintiff's tax
returns, which indicate she has not always claimed the son as her dependent.

MEMORANDUM OF DECISION – 10

Plaintiff has a twenty-three-year-old daughter ("Daughter") who

resided with her until June of 2015, when Plaintiff deeded the family home

to the bank in lieu of foreclosure. While Daughter lived with Plaintiff,

Plaintiff paid all of the housing costs. Pl.'s Mar. 2015 Dep. at 11, Ex. 342.

She also paid for many of Daughter's other expenses including, but not

limited to, her cell phone (estimated to be about $75 per month), most of

her groceries, and for Daughter's medical costs when necessary. *Id.* at 13-

14. *See also* Pl.'s Sept. 2014 Dep. at 61, 62, and 65, Ex. 343 (indicating

Plaintiff also covered Daughter's expenses for entertainment, car

insurance, and computer software for school); Pl.'s Am. Resp. to ECMC's

Req. for Produc. at 00666, Ex. 344 (listing Daughter's monthly expenses at

$189.45 per month).

Daughter was a full-time college student from fall 2009 until she

---

*See, e.g.,* Exs. 206, 207. This apparently was because Plaintiff's divorce decree
required the parents to alternate claiming the exemption. Ex. 343 at 79-80.
However, the divorce decree was never offered into evidence, and Plaintiff's
2008 tax return was amended to remove her son as a dependent because "he
resided with his father for over ½ of the year and his father provided half of [his]
support." 2008 Am. Tax Return at 2, Ex. 204.

MEMORANDUM OF DECISION – 11

graduated with a bachelor's degree in psychology in August 2014.

Daughter's Transcripts, Ex. 329.  Daughter began working in December

2014.  Pl.'s Mar. 2015 Dep. at 15, Ex. 342.  As of February 2015, Daughter

was earning a net income of approximately $1,500 per month.  *Id.* at 11;

Daughter's Pay Statements, Ex. 238.  Despite this, Plaintiff continued to

help cover Daughter's expenses because she felt much of Daughter's

income was necessary to pay Daughter's car and student loan payments,

as well as medical expenses.  Pl.'s Mar. 2015 Dep. at 13-14, Ex. 342.

Plaintiff testified that, as of trial, Daughter was financially

independent aside from being included on Plaintiff's health insurance

policy and cell phone plan.  Plaintiff testified she planned to remove

Daughter from both soon.  However, Plaintiff also testified she and

Daughter occasionally help each other make ends meet because their

paychecks are staggered.  *See, e.g.*, Pl.'s Bank Statements at 00114, 00153,

Ex. 318 (deposits from Daughter); Pl.'s Bank Statements at 00114, Ex. 318

(withdrawal to Daughter).

MEMORANDUM OF DECISION – 12

The amount of financial support Daughter has received from either her biological father, or her step-father, is not apparent from the record. However, Plaintiff testified at trial that, prior to Daughter purchasing a car post-graduation, Daughter had been using a car provided by her "father."

Plaintiff testified that the loans she obtained from DOE, the subject of the stipulation and consent judgment, were used to finance Daughter's first year of college. Plaintiff testified she felt it was necessary to obtain these loans because Daughter did not qualify for financial aid when she began college. As previously noted, Plaintiff has now agreed to repay this loan in monthly installments of $94.99 for the next 15 years. Stipulation and Consent Judgment at 3, Dkt. No. 81.

**3.     Plaintiff's Employment History and Income**

Plaintiff is a licensed Clinical Social Worker, licensed Clinical Supervisor, and holds a "Designated Examiner Certificate," which Plaintiff testified qualifies her for a variety of occupations in the social work field. Pl.'s Resp. to ECMC's Interrog. No. 6, Ex. 224. Plaintiff has been employed

MEMORANDUM OF DECISION – 13

doing social work almost continuously since she obtained her master's

degree in December 2006.  *See* Pl.'s Resp. to ECMC's Interrog.  No. 1, Ex.

225.

In March 2007, Plaintiff obtained a position as a clinical social

worker at RMF.  *Id.*  Plaintiff testified that after holding that position for

almost six years, she also started working part-time as an assessment

referral coordinator at RMF.  Eventually, Plaintiff began working solely as

a full-time assessment referral coordinator, but after about one year, in

August 2013, she voluntarily took on a less demanding position as part of

an adult mental crisis team at DHW's Behavioral Health Division.  *See Id.*

Plaintiff's annual income increased steadily throughout the early

years of her employment, from a low of $40,000 in 2007, to a high of

$58,000 in 2013.  *See* Tax Returns, Exs. 201, 204, 205, 206, 207, 211, 213.

However, when Plaintiff left RMF in 2013, she took a pay cut from $29.17

per hour to $24.00 per hour at DHW.  Pl's Pay Statement at 00536, Ex. 330.

Since then, she has received two pay increases, the last coming in April

MEMORANDUM OF DECISION – 14

2015, to $24.89 per hour. *Compare* Pl.'s Pay Statement, Ex. 107 *with* Pl.'s

Pay Statements, Exs. 108, 238.

Following the job change, Plaintiff testified she supplemented her

income on the weekends by working part-time "on-call" shifts at her

previous position. She testified she worked only one or two such shifts

between August 2013 and April 2014, and then stopped because the job

was too physically demanding while she was working full-time for DHW.

*See also* Ex. 344 at 00666; Pl.'s Resp. to ECMC's Interrog. No. 1, Ex. 224

(showing Plaintiff's start date at DHW as August 2013, while her end date

at RMF was not until April 2014).

Plaintiff's income has recently decreased because she has reduced

the number of hours she works per week. In April 2015, due to her

continuing health concerns, and at the recommendation of her supervisor,[9]

Plaintiff applied for relief under the Family Medical Leave Act ("FMLA").

---

[9] Plaintiff testified that her supervisor likely recommended this course because Plaintiff was experiencing difficulty waking up in the morning, taking naps at lunch time, requesting a lot of time off for doctor's appointments, and otherwise not being as productive at work as she should be.

MEMORANDUM OF DECISION – 15

Pl.'s Resp. to DOE's Interrog. No. 20, Ex.314.  Plaintiff testified her

application was approved and she began a reduced work schedule of 32

hours per week in June 2015.  Despite the reduction in hours, Plaintiff

testified her salary had yet to decrease because she was using accrued sick

and vacation leave to make up for her weekly day off.  However, she

testified that only about 15 hours of leave time remained, and her leave

benefits would soon be exhausted because they accrued more slowly than

she was using them.  *See also* Pl.'s Pay Statements at 00992-00997, Ex. 356

(showing that from August until October 2015, Plaintiff's accrued paid

vacation and sick leave had decreased from just over 80 hours to about 45

hours and that she only accrues about 8 hours per two-week pay period).

While Plaintiff earns less in her position at DHW than she earned at

RMF, her new position provides various benefits to Plaintiff.  For example,

Plaintiff testified that at DHW, the cost of her medical insurance

premiums, as well as deductibles, are lower.  However, Plaintiff testified

the driving factor behind her moving to the position with DHW was to

MEMORANDUM OF DECISION – 16

preserve and improve her physical and mental health.  At the time she

moved to DHW, no medical professional had recommended that she leave

her job at RMF,[10] but Plaintiff testified that her job, assessing possibly

suicidal or homicidal patients for admission to the hospital, and the

responsibility of insuring the safety of the staff, as well as the patients, was

too physically and emotionally demanding for her to perform.  Plaintiff

further testified that, apparently due to staffing issues and the many

responsibilities of her position, she often worked long weeks, had an

unpredictable schedule, and had infrequent, or sometimes no breaks

during her shifts.  She testified that while she felt overwhelmingly stressed

doing the job alone,  her requests to RMF management for extra help went

unheeded.

Plaintiff's working conditions at DHW appear to be improved.

Plaintiff testified she now has a set schedule, has a full lunch hour, and can

take a break when she needs to.  She also testified she now works on a

---

[10] Pl.'s Sept. 2014 Dep. at 40-41, Ex. 343.

MEMORANDUM OF DECISION – 17

team that can provide help when she needs it.  However, while she has

benefitted from better working conditions, Plaintiff testified that she felt

her overall health condition has not improved, and indeed may have even

become worse.  *See also* Pl.'s Mar. 2015 Dep. at 24-25, Ex. 342 (indicating

Plaintiff was unsure her new job had decreased her stress level or helped

her physically since she was still working with people with mental health

issues).  Plaintiff explained that she has experienced little relief even

working 32 hours per week because she spends her days off at various

doctors' appointments.  She also explained that, because she is using her

paid leave to supplement her decrease in income, she has no leave time

available to accommodate any prolonged absence from work.

Plaintiff testified that she has attempted to obtain other less

demanding employment in her field.  She regularly researches job listings

but has found that most open positions come with reduced or uncertain

pay.  She testified she was offered a counseling position in the private

sector, but that it included no health insurance benefits, and the pay was

MEMORANDUM OF DECISION – 18

lower and uncertain.  She also testified she applied and interviewed for a

job at RMF that would not involve the direct care of patients, but she was

not offered that position.

Plaintiff also entertained the notion of becoming a photographer, an

occupation she thinks she would enjoy.  While she underwent some

training for that occupation (discussed below), she has since discovered

that switching to that field would likely result in a significant and

unacceptable reduction in pay.[11]  Because of this, she seems to have

abandoned any plans to enter this occupation.

In sum, at her current wage of $24.89 per hour, assuming Plaintiff

works 32 hours per week, her gross pay is roughly $3,450 per month.[12]  *See

also* Estimated Schedule I at 2, Ex. 110 (indicating a slightly lower figure of

---

[11] Plaintiff apparently came to this realization when she learned that the
first opening for a photographer for which she felt she was qualified paid $16 per
hour.

[12] This figure was calculated by multiplying her hourly wage of $24.89 by
the 32 hours for her gross weekly wage, multiplying that by 52 weeks for her
annual gross salary, and dividing that by 12 to reach her gross monthly wage.

MEMORANDUM OF DECISION – 19

$3,424.46).  If she were able to work a 40-hour work week, her income

would be closer to $4,300 per month.[13]  Schedule I at 2, Ex. 108.

On her most recent schedule I, filed in the bankruptcy case

November 12, 2015, Plaintiff's approximate $4,300 gross monthly income

translated to about $3,215 in take-home pay.  Ex. 108.  The payroll

deductions Plaintiff used to calculate this figure includes not only taxes,

but also a monthly contribution to a retirement fund of almost $300,

medical and dental insurance premiums of approximately $200, and life

insurance benefits for herself[14] and her son for approximately $60.[15]  *Id.*

---

[13] The equation in footnote 12 was used, substituting 40 hours per week
for 32.

[14] Plaintiff testified she opted for the life insurance coverage at three times
her annual income, the highest amount available to her, because of her health
concerns.

[15] ECMC points out that an additional $115.13 on line 5(e) of schedule I is
likely a duplicate.  ECMC's Posttrial Brief at n. 2, Dkt. No. 94.  Even if so, it is
inconsequential as this sum is not included in the overall payroll deductions on
line 6.  Morever, at trial, using Plaintiff's pay statements, DOE's lawyer
established that the amount represented on line 6 of Plaintiff's current schedule I
is an accurate representation of Plaintiff's current monthly deductions.  *See*
Schedule I at 2, Ex. 108.  As these deductions are the same on the estimated
schedule I, aside from the smaller tax liability, the Court finds line 6 on Plaintiff's

MEMORANDUM OF DECISION – 20

Using these same deductions, and a commensurately smaller tax liability

that Plaintiff calculated, Plaintiff's estimated monthly gross pay for a 32

hour work week of $3,450 equals approximately $2,525 monthly take-

home pay.  *See* Estimated Schedule I at 2, Ex. 110 (listing monthly

deductions of approximately $925) .

**4.    Plaintiff's Expenses**

As should be expected, Plaintiff has significant monthly living

expenses.  Her most current schedule J, filed in November 2015, Ex. 109,

lists them at $3,555.46, including:

    Rent: $700
    Utilities: $540.40
    Food and Housekeeping Supplies: $667
    Clothing, Laundry, and Dry Cleaning: $95.33
    Medical and Dental Expenses: $379.49
    Transportation: $151.24
    Entertainment: $70
    Vehicle Insurance: $55.19
    Car Payment: $330
    Other Installment Payments: $481.40

---

estimated schedule I to be accurate as well.  *Compare* schedule I at 2, Ex 108 *with*
estimated schedule I at 2, Ex 110.

MEMORANDUM OF DECISION – 21

Other Expenses: $85.01[16]

*Id.* at 2.  Plaintiff testified that these amounts represent an average of those she paid during either the three or six months prior to filing this schedule.

At the time of trial, Plaintiff was renting a 3,400 square foot house for only $700 per month from a friend who was attempting to sell it.  *Id.* at 3.  Once the home is sold, though, Plaintiff will have to vacate the house, and she expects that she will have to pay at least $200 more each month in rent to find suitable housing.  Plaintiff acknowledged she might be able to locate less expensive rental housing, but she was concerned that might require her and her son to live in an unsafe neighborhood.

Plaintiff's utilities expense includes her cell phone and internet costs. She estimates this expense will decrease by approximately $75 when she removes Daughter from her cell phone plan.  Pl.'s Mar. 2015 Dep. at 13, Ex. 342.  The cost for utilities should also decrease once Plaintiff relocates to

---

[16] This figure includes expenditures for hair care, post office box rental, professional license fees, vehicle registration fees, and amounts budgeted monthly for Christmas, birthdays, and other gifts.

MEMORANDUM OF DECISION – 22

smaller housing.

On the other hand, Plaintiff testified her transportation expenses are understated because she included only her average cost for gas and oil changes.  She testified she thinks the true costs should be $20 or $30 higher to reflect the need for other regular vehicle maintenance such as tire or brake replacement.

Plaintiff owns a 2007 Toyota Camry with approximately 220,000 miles on it.  Despite its age, she testified she is making a $330 per month car payment because she refinanced the loan after her second divorce; Plaintiff thinks the car loan will be paid off next year.  However, Plaintiff explained she was experiencing an increasing number of problems with the car, and she feared that she would be required to replace it in the next couple of years.

Plaintiff testified that while her expenses for food and housekeeping may seem high, she purchases more expensive food and healthcare products due to various allergies from which she suffers (discussed

MEMORANDUM OF DECISION – 23

below).

Plaintiff's monthly medical expenses represent payments for previous medical procedures, insurance co-payments for doctor's visits, medications, and health supplements.  Pl.'s Resp. to DOE's Interrog. No. 15, Ex. 325.  This figure was generally supported by her testimony and the financial documents she produced.  Pl.'s Resp. to ECMC's Req. for Produc. Nos. 23, 24, 25, Ex. 233.  Plaintiff testified this figure would be higher at the time of trial because she had been attending counseling sessions and chiropractor appointments, which have co-payments of approximately $15–20 each.

Plaintiff's scheduled installment loan payments include a monthly payment of $100 for "Yolanda Car Loan".  Ex. 311 at 4.  Plaintiff testified that a payment labeled in the schedule as "Car" is actually a typo, and should be "Carr", the last name of her mother.  Plaintiff testified she regularly borrows money from her mother, most recently to travel to South America for photography training.  *See also* Pl.'s Mar. 2015 Dep. at

MEMORANDUM OF DECISION – 24

78–82, Ex. 342.  The trip cost approximately $5,900, and while Plaintiff was able to partially finance the trip on her own, she still borrowed roughly $3,800 from her mother.  Pl.'s Resp. to ECMC's Interrog. at 00666, Ex. 344; Pl.'s Mar. 2015 Dep. at 85–86, Ex. 342.  The parties have no written agreement concerning these loans or payments; Plaintiff's mother keeps track of how much she is owed and instructs Plaintiff concerning how much she needs to pay.  In addition to borrowing from her mother, Plaintiff has also received financial support from her father.  Plaintiff testified he recently gave her $2,000 to pay her attorney and other medical expenses.  *See also* Pl.'s Bank Statements at 00143, Ex. 318.  The record is unclear concerning if or how she intends to repay this amount.

5.     **Plaintiff's Financial Decisions**

In light of her challenging financial circumstances, in the Court's opinion, over the years, Plaintiff has made some regrettable decisions, which ECMC highlighted in these proceedings.  For example, though grossly indebted for her student loans, in 2007, Plaintiff financed the

MEMORANDUM OF DECISION – 25

purchase of a used motorcycle with her husband for $10,000.[17]  Pl's Sept.

2014 Dep. at 81, Ex. 343.  Plaintiff testified she elected to keep the

motorcycle after the divorce, and to make the loan and insurance

payments, even though she did not need it for transportation.  She testified

she later sold the motorcycle for approximately $775, though she was

aware it had a Kelly Blue Book value of a couple thousand dollars.  She

testified she had attempted to sell it for more, but could not get any other

offers because of the motorcycle's mechanical problems.  She also testified,

that because her ex-husband's name was on the loan, he at times helped

her make the payments.

Shortly after filing this adversary proceeding, when she should have

known that her financial conditions and health would be put under the

microscope, Plaintiff elected to travel to South America to participate in

the photography course, borrowing the funds to do so from her mother.

---

[17] Plaintiff testified she thought the motorcycle cost was closer to $4,000, but that the $10,000 borrowed included other costs, such as for an engine guard, windshield, and clothing.

MEMORANDUM OF DECISION – 26

She testified the training involved daily hikes and boating trips.  Plaintiff

attempted to justify her decision by explaining that, at the time she took

the trip, she was looking for a new career and did not realize that

photography would not be an economically feasible alternative.  She

testified she would need at least another year or two to repay her mother

for the trip.  In addition to this trip, Plaintiff also purchased a camera lense

for approximately $460, as well as an SD card for almost $125 to replace

one she had accidentally thrown away.  *See* Capital One Statement at

00835, Ex. 347 (purchase of camera lens); Pl.'s Mar. 2015 Dep. at 75–76, 87

(discussing the camera lens and SD card).

Plaintiff has also incurred a substantial amount of credit card debt

since discharging significant amounts of debt in her bankruptcy case.[18]

The statements for her two Capital One credit cards reflect that she owes

approximately $2,800 and $3,300 as of November 2015.  Ex. 357 at 01034,

_____

[18]  According to her schedules, Plaintiff sought to discharge over $100,000
of unsecured debt.  *See In re McDowell*, No. 10-40845-JDP, Plaintiff's chapter 7
petition at 31, Dkt. No. 1 (May 14, 2010); Order Granting Discharge, Dkt. No. 20
(Sept. 7, 2010).

MEMORANDUM OF DECISION – 27

01076.  As of March 2015, her Kohl's and Amazon credit card balances were approximately $765 and $220 respectively.  Ex. 317 at 00361.  While Plaintiff testified she felt these balances were incurred for necessary expenses, she also testified that she spent approximately $835 dollars on food and gas during a trip to see family in California in November 2013, and at least another $310[19] on a trip to Yellowstone in September 2013.  *See* Ex. 347 at 00834 (California Trip); Ex. 347 at 00838 (Yellowstone trip).[20] Plaintiff's schedule J reflects that her current monthly credit card payments are approximately $400.

Plaintiff also routinely incurs various bank and credit fees and

---

[19] ECMC argues this trip cost the full $638.94 reflected on that month's credit card statement.  ECMC's Posttrial Brief at 11, Dkt. No. 94.  However it seems a majority of the charges for that month were made in or around Plaintiff's place of living after the trip to Yellowstone.  *See* Ex. 347 at 00838–00839.

[20] While not charged to her credit card, Plaintiff also testified she traveled to Salt Lake in July 2015, to take photographs for a friend to help build Plaintiff's photography portfolio.  However, Plaintiff testified she was compensated for various expenses and the only expense of record is $44 for one dinner.  Plaintiff testified about another trip to build her portfolio by photographing the wedding of a friend in Nevada, but the time frame and expenses of the trip were not established.

MEMORANDUM OF DECISION – 28

charges.  She testified that she frequently over-drafts her checking account

knowing that the practice costs her $35 per transaction.  *See, e.g.*, Ex. 318 at

00130, 00152.  She testified she tries to do this only once per month, for an

amount she feels will cover her expenses for the remainder of the month,

to avoid incurring this fee multiple times after she has exhausted her

funds.  Plaintiff also testified that she often is a month behind on internet,

credit card, and cell phone payments, which causes her to incur various

late fees and charges.  *See, e.g.*, Ex. 358 at 01167 (Verizon); Ex. 347 at 00776-

00777 (October 2014 Capital One Statement reflecting a $35 late fee with

fees for the year of $199); Ex. 322 at 00187 (Cable One).  However, she

stated that she sometimes makes late credit card payments because she is

living paycheck to paycheck.  Pl.'s Mar. 2015 Dep. at 71, Ex. 342.  Despite

the financial difficulties causing her to incur these charges, Plaintiff

nonetheless decided to finance a new cell phone for her son that cost

almost $600, adding an additional $27 to her monthly cell phone bill.  Ex.

358 at 01180.

MEMORANDUM OF DECISION – 29

Plaintiff also admitted she did not make her mortgage payments from August 2014 until she signed the deed in lieu of foreclosure in June or July 2015.  Pl.'s Resp. to DOE's Interrog. No. 17, Ex.325; Pl.'s Supp. Resp. to DOE's Interrog. No. 13, Ex. 314.  Her September 2014 mortgage statement reflects that she may have been skipping payments prior to that time, but Plaintiff testified that while her mortgage statement reflected past due payments, during that time she was on some sort of repayment plan to help her catch up.  Sept. 2014 Mortgage Statement at 1, Ex. 352. She testified she could not recall what she had done with the extra funds from not making her mortgage payments, but that she was just trying to make it through month to month.

Plaintiff also acknowledged that she received significant tax refunds in 2012 and 2013, but she could not recall how she had spent the funds. *See* 2013 Federal Tax Return at 0093, Ex. 213 (showing a refund of $3,105); 2012 Federal Tax Return at 0114, Ex. 211 (showing a refund of $1,489).  On a smaller scale, in response to questioning by counsel, Plaintiff could not

MEMORANDUM OF DECISION – 30

recall where numerous cash withdrawals she had taken from her bank account were spent, although she testified the more recent withdrawals may have been made to implement a cash budgeting system she learned at a financial course she recently attended.

**6.      Plaintiff's Health**

Plaintiff's medical records document the various health issues she has experienced since her student loans became due in 2007.  *See* Ex. 103. In particular, the medical records from Dr. Eric W. Perttula indicate test results suggesting that Plaintiff was experiencing low thyroid levels as early as August 2010.  Ex. 103 at 0001.  However, a formal diagnosis with attendant treatment for this condition did not begin until 2013.[21]  *See also* Ex. 203 at 0024.  Plaintiff's medical records show that, since the 2013 diagnosis, doctors have struggled to regulate her thyroid levels.  Ex. 103 at 0027, 0029, 0035.  Earlier medical records also indicate that she began

---

[21] Dr. Cook's report (discussed below) notes that Dave Holland, C.N.P., first started Plaintiff on thyroid medication in July 2013, but that particular record is not before the Court.  Ex. 100 at 5.

MEMORANDUM OF DECISION – 31

receiving treatment for migraines as early as 2011.  Ex. 103 at 0015.

Plaintiff also testified she was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") in college, which causes her to have difficulties concentrating, focusing, and processing thoughts.  She previously was able to successfully treat this condition with medication; however, she testified that her medication has been less effective since her thyroid problems began.

In addition to these early issues, Plaintiff testified the bulk of her current health problems began in 2012.  That year she underwent two surgeries, one to correct a birth defect in her sinuses, and another for an injury to her knee.  She testified it was then that she began to feel like she could not function normally due to fatigue, headaches, sudden weight gain,[22] and problems thinking clearly.

Plaintiff began seeing her current primary physician, Dr. Laramie Wheeler, in early 2015; she consulted her numerous times prior to trial.

---

[22] *See* Ex. 103 at 0024 (indicating Plaintiff had gained 37 pounds in two years, and 50 pounds in three years)

MEMORANDUM OF DECISION – 32

*See* Exs. 102, 112, 317.  Dr. Wheeler has worked with Plaintiff to treat her various symptoms.  *See* Ex. 112 at 4 (describing Plaintiff's symptoms). Since that time, Dr. Wheeler has given Plaintiff an array of diagnoses of her problems including fatigue, generalized pain, myalgia, insomnia, gluten intolerance, hypothyroidism, hyperlipidemia, insulin resistence, migraines, parasthesia in her legs, and right shoulder pain, among other things.  *See* Exs. 102, 112.

While not described in the medical records, Plaintiff testified, and Dr. Wheeler explained in a letter dated March 2, 2015, that Plaintiff also likely suffers from an auto-immune disease that is contributing to her symptoms.  *See* Ex. 102 at 1.  Plaintiff described this disease as one where her body is attacking itself, and that the symptoms included daily generalized pain.  Shortly before trial Plaintiff was also diagnosed with sleep apnea, the treatment of which has ameliorated some of her fatigue. Ex. 102 at 13.

Plaintiff testified that because she has not responded to traditional

MEMORANDUM OF DECISION – 33

methods of treatment, Dr. Wheeler has, with some success, treated her

with a combination of prescription medication, over-the-counter

medication, and herbal supplements.[23]  *See* Ex. 102 at 1.  *See also., e.g.*, Ex.

112 at 6, 11 (indicating the treatments Dr. Wheeler has prescribed).

In the letter dated March 2, 2015, Dr. Wheeler stated it is probable

that Plaintiff's various health problems are chronic and likely to persist

through her lifetime.  Ex. 102 at 1.  In a later letter dated May 5, 2015, Dr.

Wheeler opined that Plaintiff's job-related stress is a cause of some of her

problems, and that if she continues to work as a social worker, Plaintiff

will continue to experience symptoms, which will eventually lead to a

premature death.  Ex. 112 at 3.

Plaintiff also testified she suffers from food allergies, including

gluten and dairy intolerance, which necessitated an extreme change in her

diet.  While her medical records do not indicate any specific diagnosis

---

[23] Plaintiff testified that these supplements are meant to help her adrenal
glands and her auto-immune response.  One was a liquid tincture containing
various herbal extracts to treat her symptoms such as inflammation, pain, and
her ability to focus.

MEMORANDUM OF DECISION – 34

concerning dairy, Dr. Wheeler stated in the March 2 letter that she was

treating Plaintiff for gluten intolerance, which Plaintiff testified began after

she told Dr. Wheeler she had some of the symptoms.  Ex. 102 at 1.  In a

response to an interrogatory, Plaintiff indicated she had seen a Dr. Gene

Petty about her food allergies and underwent allergy testing, but those

records and test results were not provided to the Court.  Pl.'s Resp to

ECMC's Interrog. No. 8, Ex. 224.  Plaintiff also testified that she has been

seeing a nutritionist who prescribed a special diet, but there is no

documentation of her visits with the nutritionist in the record.  As

indicated previously, Plaintiff testified, that due to her allergies, she must

often buy supplemental shakes as meal replacements.  She also testified

she must use specialized makeup, lotions, soaps, and even bathroom

tissue, all of which are more expensive than normal.

    In addition to providing the Court with Plaintiff's medical records,

both parties retained doctors to conduct an independent medical

examination ("IME") of Plaintiff.  Their opinions are at odds with each

MEMORANDUM OF DECISION – 35

other, as well as with that of Dr. Wheeler.

### a.    Dr. David C. Simon

Dr. Simon[24] was retained by Defendants and examined Plaintiff on

July 28, 2015.  He testified the examination lasted less then twenty minutes

and that he spent the majority of that time asking her questions.  While he

testified that he generally reviewed examinees' medical histories prior to

such examinations, he apparently did not do so prior to meeting Plaintiff.

Dr. Simon's report highlights some of Plaintiff's medical history

including her thyroid dysfunction, insulin resistance, dyslipidemia,

depression, anxiety, joint pain, ADHD, and migraines.  *See* Simon's Report

at 2-3, Ex. 247.  Despite these notes, Dr. Simon testified that he did not

discuss, or could not recall discussing, Plaintiff's complaints about

headaches, memory loss, or problems concentrating.  He did, however,

---

[24] Dr. Simon testified he has been a medical doctor since 1995.  He specializes in physical medicine and rehabilitation and currently works at the Eastern Idaho Medical Center where he works with brain injuries, trauma, orthopedic, and some cardiac rehabilitation.  He also has a private practice where he focuses on musculoskeletal problems and neurological testing in addition to performing independent medical exams.

MEMORANDUM OF DECISION – 36

talk with Plaintiff about her thyroid issues, and recalled that Plaintiff told

him that she had consulted an endocrinologist who diagnosed her with

Metabolic X Syndrome,[25] but that she discontinued seeing him because she

did not trust him.

Dr. Simon testified that what stood out to him during the

examination was that Plaintiff's pain was an aching, and that she said only

stress made it worse, not physical activity.  *See also, Id.* at 4.  He testified

the evaluation was otherwise unremarkable in terms of any medical

issues, and noted she had a good range of motion for her lower back,

indicating a low chance of lower back problems.

As for Plaintiff's pain levels, Dr. Simon's report seems inconsistent.

At trial, DOE's lawyer focused on Plaintiff's score on the "McGill Pain

Questionnaire."  In that respect, the report states:

> The McGill Pain questionnaire specifies 15 potential pain
> descriptors.  The examinee rates the intensity of each descriptor

---

[25]  The parties offered no information or explanation about Metabolic X
Syndrome, and the Court is unfamiliar with this condition.

MEMORANDUM OF DECISION – 37

> on a scale of 0 to 3.  The total of all descriptors was 1. The total
> of the 11 somatic descriptors was 1, averaging .1 and the total of
> the 4 affective descriptors was 0.

*Id*. at 6.  Dr. Simon further testified that, while not in the report, Plaintiff

also rated her overall pain as somewhere between the categories of mild

and discomfort.  However, in addition to the McGill questionnaire, under

"Current Status," the report discloses that "the examinee reports the pain

now is a 3.  During the last month the pain averaged 3–4, with a high of 8,

and a low of 2."  *Id.* at 4.  Based upon the testimony, to the Court, the

discrepancy in the scores is likely explained by Plaintiff's frame of

reference when filling out the McGill questionnaire.  Plaintiff testified she

filled out the form according to how she felt that day before work; Dr.

Simon confirmed she did in fact fill out the form the day of the

appointment.  Moreover, Dr. Simon testified that, at the examination, he

did not explain to Plaintiff whether her answers to the McGill

questionnaire should reflect how she was feeling at that time, or more

generally.

MEMORANDUM OF DECISION – 38

Dr. Simon concluded in his report that "the only objective diagnosis I can give her is obesity." *Id.* at 6. The report further provided that, "[o]besity would not keep her from working full-time. There are no objective findings on examination or in her medical records that would necessitate work restrictions." *Id.*; *see also* Ex. 249 at 1 (finishing the sentence Dr. Simon had accidentally omitted a portion of). Dr. Simon also noted Plaintiff had "subjective pain and fatigue", and that this could be a sign of a number of things, but none were confirmed and all would be treatable, even a thyroid problem. Simon's Report at 6. Dr. Simon also noted Plaintiff reported herniated discs and annular tears, but that there was no record of these injuries, and that if she did have them at some point, they would have healed by now. *Id.* However, Dr. Simon did testify that the appropriate way to diagnose such injuries is by an MRI, and that if an MRI so indicated, then he would agree she did in fact have those injuries.

**b.    Dr. Gary L. Cook**

MEMORANDUM OF DECISION – 39

Dr. Cook,[26] Plaintiff's expert witness, examined Plaintiff on August 7, 2015.  He reviewed Plaintiff's medical records prior to the examination, examined and spoke with her for roughly an hour, and then again reviewed her records and spoke with her via telephone to resolve any discrepancies and get a more detailed history.  He testified he probably spent six to eight hours reviewing Plaintiff's medical records.

Dr. Cook testified that he relies on the latest and most well-regarded online sources, and medical journals and texts in making his diagnoses. He further testified that he places great weight on a treating physician's opinions because they have usually spent much more time with the patient.  In this case, he felt Dr. Wheeler had had the most success in ameliorating some of Plaintiff's symptoms.  And, in regard Dr. Wheeler's May 15 letter, Dr. Cook stated, "[a]lthough stark statements regarding the probability of a premature death are rare in medical opinions, this

---

[26] Dr. Cook testified he had primarily practiced anesthesiology and pain management for 28 years before entering private practice in 2008, about the same time he started conducting IMEs.

MEMORANDUM OF DECISION – 40

examiner is in complete agreement with this practitioner's conclusions." Cook's Report at 8, Ex. 100.

When asked about Dr. Simon's report, Dr. Cook expressed concern that Dr. Simon had not completely accounted for, and had too easily dismissed, Plaintiff's various symptoms. *Id.* at 9-11. Ultimately, Dr. Cook strongly disagreed with Dr. Simon's conclusion that there is nothing preventing Plaintiff from working full-time, and noted Dr. Simon's conclusion is also at odds with Dr. Wheeler's opinion. *Id.* at 11. As for Plaintiff's pain levels, Dr. Cook's pain disability questionnaire scored Plaintiff at a "92 Moderate Disability." *Id.* at 15.

Dr. Cook diagnosed Plaintiff with several conditions. His first diagnosis was subclinical hyperthyroidism, possibly of iatrogenic origin. *Id.* at 15-16. His report provides a detailed explanation for his diagnosis, and provides the following excerpt from an article called "Clinical Impressions and Management of Subclinical Hyperthyroidism: A Review:"

MEMORANDUM OF DECISION – 41

> The detrimental effects of [subclinical hyperthyroidism] have
> been extensively studied and its effect on the cardiovascular
> system, the skeleton, mood disturbance, quality of life is quite
> significant leading to considerable morbidity and mortality.
>
> Majority of the patients are asymptomatic and lack overt
> features . . . the issue is contentious, the situation is challenging
> and the benefits of treatment are debatable.  The consensus for
> who, when and how to treat is growing but still hasn't been
> universally accepted.

Ex. 100 at 17.

ECMC points out that this article also provides that the significance

of the disease is uncertain for most patients as their thyroid may revert to

normal, remain static, or become worse.  ECMC's Posttrial Brief at 14, Dkt.

No. 94.  ECMC also notes other excerpts in the article provide there is no

uniform recommendation for treatment, and it is often hard to draw firm

conclusion about the effect of the disease on mood, affective disorders or

quality of life.  *Id.* at 14–15.  When confronted at trial with this criticism of

his reliance upon this article, Dr. Cook testified he agreed that there is still

no consensus as to the outlook of the disease or the treatment.  However,

in regards to its effect on those who suffer from the disease, he felt the

MEMORANDUM OF DECISION – 42

article was outdated and that since it was published, the U.S. Preventive

Task Force and other studies have come to some convergence of opinion.

*See also* Cook's Addendum at 4–5, Ex. 101.  However, he testified the

quality of the evidence is still low.  *See also Id.*  Despite this admission, he

testified that Plaintiff's symptoms were likely to persist and that the

continuation of her current work was problematic.[27]

Dr. Cook recognized that his diagnosis disagreed with Plaintiff's

treating physician's diagnoses of *hypo*thyroidism.[28]  He testified that this is

likely because subclinical hyperthyroidism is an obscure diagnosis[29] and

that it shares many of the symptoms of hypothyroidism.  However, he

---

[27] In commenting on thyroid dysfunction in general, Dr. Cook testified
that the thyroid regulates overall metabolism of the body at a cellular level,
controls heart rate and levels of energy, and is pervasive and influences every
function of the body, particularly on a cognitive basis.  Some symptoms include
fatigue, weakness, memory problems, anxiety, problems concentrating and
attending to tasks, some of which he observed during his examination.

[28] Dr. Cook also rejected other diseases that could account for some of
Plaintiff's symptoms including: Hashimoto's thyroiditis, chronic fatigue
syndrome, and fibromyalgia.  Cook's Report at 19-20.

[29] Dr. Cook testified that this diagnosis affects only about 0 to 2 percent of
patients with thyroid dysfunction.

MEMORANDUM OF DECISION – 43

testified there are distinct differences that Plaintiff exhibited.  Cook's

Report at 18-19, Ex. 100.  Also, while on the witness stand, Dr. Cook

reviewed Plaintiff's lab work he had previously not seen, and testified it

supported his opinion.

Dr. Cook's also diagnosed Plaintiff with "Chronic Headaches,

Mixed. Possible Cervicogenic Origin."  *Id.* at 20.  The report provides that

"Plaintiff's debilitating headaches affecting her concentration, focus,

attention, cognition and job function may have a cervicogenic component."

*Id.* at 21.  It further provides that this particular type of migraine

"demonstrate the greatest loss in domain of physical functioning when

compared with the groups with other headache disorders."  *Id.*

Ultimately, Dr. Cook concluded that because the required diagnostic steps

had not been pursued by any of her practitioners to date, Plaintiff should

consult with a qualified neurologist to evaluate her.

Dr. Cook also diagnosed Plaintiff with chronic low-back pain,

chronic cervical and shoulder pain, and right upper-extremity weakness.

MEMORANDUM OF DECISION – 44

*Id.* at 22.  He testified these were apparent at Plaintiff's physical examination, and while Dr. Simon thought her back should be healed by now, the environment of the spine is not conducive to healing.

Finally, Dr. Cook diagnosed Plaintiff with chronic pain syndrome, one symptom of which is "symptom magnification."[30]  *Id.* at 23–24. However, he stated, this should not disqualify or diminish her symptoms or complaints because her symptom magnification was appropriate for the level of pain she experiences.  He also testified that chronic pain can reflect a reprogramming of the brain, so that even once an injury is healed, a person can still interpret normal sensations as pain.

Dr. Cook concluded that Plaintiff's current work duties are problematic.  Cook's Report at 25, Ex. 100.  However, his ultimate prognosis was "uncertain to guarded" due to the uncertainty surrounding her particular illnesses, and he testified the salient issue was obtaining a

---

[30]  Dr. Cook's report explains that symptom magnification can be created by "fear of having learned that certain actions or positions provoke pain" or "can be a response to feeling discounted or mistrusted, so that one must emphasize symptoms to persuade the physician of their reality."  Cook's Report at 24.

MEMORANDUM OF DECISION – 45

definitive diagnoses or explanation of her thyroid dysfunction. *Id.* at 26.

He also felt that Plaintiff had a probability greater than 51% of requiring

future medical surgical treatment for pain arising from diagnoses of

thyroid disease and back pain. *Id.* at 27. He testified that overall, to a

reasonable degree of medical certainty, Plaintiff experiences chronic pain,

particularly in her neck and shoulder area, and will likely have it for the

rest of her life. As for the thyroid problem, his impression was that most

thyroid conditions are of a permanent nature and require treatment of a

permanent nature (either taking medication for the rest of her life or

destroying and removing her thyroid altogether).

Finally, Dr. Cook testified that, to a reasonable degree of medical

certainty, Plaintiff's continued work will accelerate her medical condition.

He testified she has a history of cardiac rhythm disturbances evidenced by

medical records, a rapid heart rate when she has anxiety attacks, and skip

beats, all of which predispose her to cardiac events, stroke, and other life

threatening conditions. He testified this history combined with her

MEMORANDUM OF DECISION – 46

thyroid dysfunction puts her at risk of a cardiac event.

### c.   Plaintiff's Mental Health

In addition to her physical ailments, Plaintiff explained that she also struggles with anxiety, which she testified has been aggravated by her lack of ability to focus and think clearly while treating patients. *See also*, Ex. 112 (diagnosing Plaintiff with anxiety); Cook's Report at 23, Ex. 100. Dr. Cook testified that Plaintiff told him that she experiences panic attacks, which are infrequent, but are paralyzing when they do occur.

Plaintiff also has been diagnosed with depression, which she testified stems from her inability to do her job and not feeling well everyday. Ex. 102 at 8; Cook's Report at 23, Ex. 100. She testified she temporarily took an anti-depressant medication, but it led to suicidal thoughts, and was discontinued. She testified she has not attempted another anti-depression medication since that time. This seems to be at the suggestion of Dr. Wheeler. Ex. 102 at 9 (noting "Is struggling with depression. Not badly enough to try prescription medication (Prozac made

MEMORANDUM OF DECISION – 47

her suicidal).") As previously mentioned, Plaintiff recently began attending counseling sessions again.

Dr. Cook testified these diagnoses are also of a permanent nature, especially in the stressful environment of her work.  He felt that without Plaintiff's training in mental health care, the severity of her problems would probably be even more debilitating.

### d.    Subsequent Opinions

After reviewing Dr. Cook's report, and while the trial was pending, Dr. Simon authored another report indicating that nothing had changed the opinions he expressed in his original IME report.  *See also* Simon Letter at 1, Ex. 249.  While he felt a third endocrinologist evaluation was unnecessary because Plaintiff had dismissed the opinions of two prior endocrinologists, he ultimately admitted that an endocrinologist would be the most qualified to help Plaintiff with her thyroid problems.  *See Id.*  However, he testified he was certain the treatment was most likely as simple as taking Plaintiff off of her current thyroid medication, and that

MEMORANDUM OF DECISION – 48

even if she had the disease it was treatable.  *See also Id.*

As for Plaintiff's prior visits with endocrinologists, Plaintiff testified that she had in fact seen two endocrinologists: Dr. Vance and Dr. Prichione.  Plaintiff had previously stated she stopped seeing Dr. Vance because he was "mean and horrible."  Ex. 342 at 90 ln. 7.  However, she testified it was not that she did not like what he was saying, but that she did not like how she was being treated.  She further testified that to her, it was normal for someone who is dissatisfied with a care provider to seek help elsewhere.

In response to Dr. Simon's recommended method of treatment, Dr. Cook stated that Dr. Simon's suggestion was simplistic and overlooked the complexities and controversies regarding treatment of subclinical hyperthyroidism.  Cook's Addendum at 3, Ex. 101.  Dr. Cook testified there were risks associated with simply removing the medication because the body may have become dependent on it, and that Dr. Simon's suggestion reflected his lack of familiarity with the diagnosis.  *See also Id.*

MEMORANDUM OF DECISION – 49

Dr. Cook again noted there was still controversy within the medical community as to the proper treatment of the disease.  *Id.* at 3-5.

Plaintiff testified she had yet to see another endocrinologist as of trial.  She testified she found Dr. Wheeler to be more helpful than the endocrinologists she had previously seen, and that Dr. Wheeler was still treating her for the auto-immune response that Dr. Wheeler thought was causing her thyroid levels to fluctuate.  Plaintiff further testified that despite lab results indicating that she does not have Hashimoto's disease, Dr. Wheeler was still treating her as if she does.

Finally, regarding her back problems, Plaintiff provided an MRI report of her lumbar spine[31] that notes:

> Minimal broad-based disk bulges at L3-L4 through L5-S1 with small foci of increased subannular signal along the posterior aspect of L4-L5 posterior central aspect of L5-S1.  Both of these small foci of increased signal are unchanged and are nonspecific but could represent subannular tears.

―――――――――――

[31]  An MRI report regarding Plaintiff's cervical spine from May 2011 was also presented to the Court, but as near as the Court can tell, it was unremarkable.

MEMORANDUM OF DECISION – 50

Ex. 114 at 1.  However, this MRI is dated March 2010, and a more recent

evaluation was not presented to the Court.  *Id.*  Plaintiff testified she is

currently seeing a chiropractor for these issues, but records of these visits

are not in evidence.  Moreover, her more recent medical records make

limited reference to back pain.  *See* Ex. 112, 102, 103.  Plaintiff testified this

is because she is focused on solving her more serious health concerns with

Dr. Wheeler.

In addition to the physicians' IME reports, Defendants also

submitted a report in evidence from Nancy J. Collins, a certified

rehabilitation counselor, a forensic vocational expert, a senior disability

analyst, and certified life care planner.  Ex. 248.  The parties stipulated that

Collins had reviewed Dr. Cook's report prior to writing her report.

In her vocational assessment, Collins concluded that Plaintiff could

work in several other social work related jobs, or change fields to human

resources or higher education.  *Id.* at 13-15.  Of the positions suggested,

only one position would result in any substantial increase to her current

MEMORANDUM OF DECISION – 51

rate of pay, and in fact, a few of the suggested positions would result in a

decrease in hourly wage.  *See Id.*

Concerning Plaintiff's health and her ability to work, the report

provides that, "[Plaintiff] does not have any specific physical restriction

from any of the medical providers" and "[Plaintiff's] subjective complaints

have been consistent over time, but not consistent with any one diagnosis.

As far as I can tell, there is still no confirmed medical diagnosis for her that

explains her multiple subjective complaints."  *Id.* at 6.

Collins' ultimate conclusion was that, to a reasonable degree of

certainty, Plaintiff did not have to leave the field of social work because

there are less stressful positions within that field.  *Id.* at 15.  She also noted

that Plaintiff was now seeing a therapist and was receiving

accommodations at work for her medical issues.  *Id.* at 15.  Collins further

concluded that if social work was too stressful, Plaintiff could find a less

stressful job in another field, with wages comparable to what she is

earning currently.  *Id.*

MEMORANDUM OF DECISION – 52

### Conclusions of Law, Analysis and Disposition

Obtaining relief from student loan debts in bankruptcy is an arduous task.  Student loan obligations are presumed to be nondischargeable in bankruptcy.  *Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1087 (9th Cir. 2001).  More precisely, § 523(a)(8) provides that a student loan may be discharged only if it is shown that "excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents . . . ."

The Code does not define undue hardship.  *Educ. Credit Mgmt. Corp. v. Jorgensen (In re Jorgensen)*, 479 B.R. 79, 86 (9th Cir. BAP 2012) (citing *Educ. Credit Mgmt. Corp v. Nys (In re Nys)*, 446 F.3d 938, 944 (9th Cir. 2006)).  However, that a debtor will struggle if a student loan must be repaid is not enough, since "the existence of the adjective 'undue' indicates that Congress viewed garden-variety hardship as insufficient excuse for a

MEMORANDUM OF DECISION – 53

discharge of student loans." *Rifino*, 245 F.3d at 1087.[32]

To determine when a debtor's student loans will impose an undue

hardship on the debtor if excepted from discharge, the Ninth Circuit, long

ago, adopted the test first announced in *Brunner v. N.Y. State Higher Educ.*

*Serv. Corp. (In re Brunner)*, 46 B.R. 752, 756 (S.D.N.Y. 1985), *aff'd* 831 F.2d

395, 396 (2d Cir. 1987). *United States Aid Funds, Inc. v. Pena (In re Pena)*, 155

---

[32] Moreover, that the evidence demonstrates that it is more likely than not that, as a practical matter, a debtor will not repay a loan is also not dispositive under the undue hardship standard. *See Educ. Credit Mgmt. Corp. v. Mason (In re Mason)*, 464 F.3d 878 (9th Cir. 2006) (reversing bankruptcy court's decision to grant partial discharge because despite satisfying the first two prongs of the *Brunner* test, the plaintiff had failed to make good faith efforts to repay his loans). *See also Maulin v. Salliemae (In re Maulin)*, 190 B.R. 153, 157 (Bankr.W.D.N.Y.1995) ("Although it mandates no particular demonstration, good faith effort does require some evidence beyond a showing of financial incapacity."). While, one might wonder why the bankruptcy law would prohibit the discharge of student loans when the proof demonstrates little likelihood they will ever be repaid, that is a policy issue for Congress, not this Court. *In re Fulbright*, 319 B.R. 650, 659 (Bankr. D. Mont. 2005) (citing *Lamie v. United States Trustee*, 540 U.S. 526, 124 S.Ct. 1023, 1034 (2004)). Similarly, the wisdom of "loaning" students more than they can ever realistically be expected to repay, and the consequences for students, parents, and our Nation, resulting from our increasingly large "student-debtor class," is yet another issue for the policymakers. Suffice it to say, in the opinion of this bankruptcy judge, it is doubtful the Code's and courts' current approach to this serious problem is up to the task. *See Roth v. Educ. Credit Mgmt. Corp. (In re Roth)*, 490 B.R. 908, 920-923 (9th Cir. B.A.P. 2013) (Pappas, B.J., concurring).

MEMORANDUM OF DECISION – 54

F.3d 1108, 1112 (9th Cir. 1998). The test consists of three prongs, requiring a debtor to prove: (1) the debtor cannot maintain, based on current income and expenses, a minimal standard of living if forced to repay the loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) the debtor has made good faith efforts to repay the loans. *Brunner*, 46 B.R. 752, 756 (S.D.N.Y. 1985), *aff'd* 831 F.2d 395, 396 (2d Cir. 1987).

The debtor bears the burden of proving all three prongs by a preponderance of the evidence. *Rifino*, 245 F.3d at 1087-1088; *Bryant v. Wells Fargo Bank (In re Bryant)*, 99.3 IBCR 118, 119 (Bankr. D. Idaho 1999). Because the three prongs are independent requirements, "[f]ailure to prove any one precludes discharge." *Roth*, 490 B.R. at 916 (citing *Carnduff v. U.S. Dep't of Educ. (In re Carnduff)*, 367 B.R. 120, 127 (9th Cir. BAP 2007).

Below, the Court examines each of these requirements in light of the evidence in this case.

MEMORANDUM OF DECISION – 55

1.    **Minimal Standard of Living**

This prong has been described as prescribing the "minimum

necessary to establish 'undue hardship'" and that it "comports with

common sense." *Pena*, 155 F.3d at 1111.  To satisfy its requirements, as

applied here, Plaintiff must show "more than simply tight finances" and

"more than temporary financial adversity," although her condition may be

"short of utter hopelessness." *United States Aid Funds v. Nascimento (In re*

*Nascimento)*, 241 B.R. 440, 445 (9th Cir. BAP 1999).

Maximization of income by the debtor is not necessary to satisfy this

prong. *Educ. Credit Mgmt. Corp. v. Mason (In re Mason)*, 464 F.3d 878, 882

n.3 (9th Cir. 2006).  Calculating the debtor's appropriate cost of living is

factual in nature and "is a matter properly left to the discretion of the

bankruptcy court." *Jorgensen*, 479 B.R. at 87 (citing *Pena*, 155 F.3d at 1112).

Under this analysis, a "dependent" is a minor child or other person

to whom the debtor owes a legal obligation to support.  Thus, adult

children are generally not considered to be dependents for purposes of this

MEMORANDUM OF DECISION – 56

analysis. *Carlson-Callow v. Sallie Mae Servicing (In re Carlson-Callow)*, 2008 WL 2357012 *6 (Bankr. D. Idaho 2008). As a result, in this case, only Plaintiff's son is a dependent.

Plaintiff argues she has satisfied the first prong of the *Brunner* test because her medical problems have caused her to simultaneously experience a decrease of income as well as an increase in expenses. Pl.'s Pretrial Br. at 5, Dkt. 73. In contrast, ECMC argues that Plaintiff can maintain a minimal standard of living and repay her loans because she can earn more than she is currently making, and because her claimed living expenses are too high, merely reflecting that she has not adequately managed her money. ECMC's Posttrial Br. at 5-11, Dkt. No. 94.

As income maximization is more appropriately considered in connection with the other prongs of the *Brunner* test, to test Plaintiff's satisfaction of this prong, the Court will consider Plaintiff's current salary, working 32 hours per week, earning approximately $3,400 per month, and her current expenses.

MEMORANDUM OF DECISION – 57

As for expenses, generally speaking, Plaintiff's payroll deductions and monthly out-of-pocket expenses generally show that she maintains a minimal, rather than some higher standard of living.   A few of her expense item, though, deserve specific comment.

First, while ECMC criticizes it, the Court does not question Plaintiff's decision to carry life insurance coverage that would, in the event of her death, pay her beneficiary three times Plaintiff's annual income. Nor is the Court concerned with Plaintiff's decision to carry dental insurance.  On the other hand, because Daughter is not a dependent for these purposes, the Court finds Plaintiff's payroll deductions are overstated to the extent Daughter is covered under Plaintiff's medical insurance.  Even so, the parties never established whether removing Daughter from Plaintiff's coverage would reduce her premiums, and if so, by how much.[33]

---

[33] ECMC has not challenged the reasonableness of Plaintiff's retirement contribution, and the Court deems it to be reasonable under Plaintiff's particular circumstances.  *See Craig v. Educ. Credit Mgmt. Corp. (In re Craig)*, 579 F.3d 1040, 1046 (9th Cir. 2009) (quoting *Hebbring v. U.S. Trustee*, 463 F.3d 902, 907 (9th Cir.

MEMORANDUM OF DECISION – 58

As for Plaintiff's other expenses, her desire to increase her prior budget to account for higher medical and transportation expenses is reasonable.  Moreover, her monthly installment payments should be increased to reflect the payments she has now committed to pay to DOE. As such, her claimed monthly expenses would be closer to $3,750.

However, of that $3,750, Plaintiff's monthly utility costs are overstated to the extent they include the $75 in her cell phone bill attributable to Daughter's phone, any fees she incurs for late payments, and the approximately $27 payments necessary to cover her son's expensive phone.  Assuming this results in at most $100-150 overstatement, Plaintiff's monthly expenses to maintain a minimal standard of living for her and her son amount to at least $3,600.

Aside from these minor adjustments, the Court finds Plaintiff's expenses consistent with a minimal standard of living.  Despite occupying

---

2006) ("bankruptcy courts have discretion to determine whether retirement contributions are a reasonably necessary expense for a particular debtor based on the facts of each individual case.")

MEMORANDUM OF DECISION – 59

an unnecessarily large house, Plaintiff is paying below-market rent.  And,

while Plaintiff's budget for food and housekeeping supplies are arguably

high, this is primarily due to her special needs, dietary restrictions, and

allergies.  ECMC pointed out, and the Court agrees, that Plaintiff and her

son have a propensity to eat outside of the home, primarily at "fast food"

restaurants, which inflates food costs.  But, the Court is also mindful that

Plaintiff is a working, single mother who has an active teenage boy to feed.

Given the other demands in her life and Plaintiff's health concerns, a

modest expense for eating out is not inappropriate in measuring a minimal

standard of living.  Moreover, any reduction proposed to address this

factor would be inconsequential.

The Court is also satisfied that Plaintiff's medical expenses are

justified and reasonable.  The combination of paying past medical bills,

current co-payments, as well as the costs for prescription drugs and

supplements, was adequately supported in the evidentiary record and the

amount claimed in Plaintiff's budget is rational.

MEMORANDUM OF DECISION – 60

Finally, while ECMC objects, the Court considers it appropriate for Plaintiff to include credit card payments as an expense item. The reality is that her failure to make these payments would result in the imposition of further fees, late charges, and collection costs. And, while the Court suspects that some of the credit card charges resulted from Plaintiff's poor spending decisions, these arguments are more appropriately considered under *Brunner's* third prong.

In sum, under the first prong, Plaintiff's approximate $2,550 net income is inadequate to satisfy the $3,600 or so in necessary living expenses she incurs each month. Because Plaintiff is currently living at a deficit without paying any amount on her ECMC student loans, the Court concludes that Plaintiff could not maintain a minimal standard of living were she required to repay those loans.

**2.    Additional Circumstances**

The second prong requires Plaintiff to prove that her "present inability to pay will likely persist through a substantial portion of the

MEMORANDUM OF DECISION – 61

loan's repayment period." *Nys*, 446 F.3d at 945.  Due to the difficulty of

predicting future income, courts have required the debtor to demonstrate

that "additional circumstances" exist to prove that their present financial

situation will persist well into the future.  *Id.*  A nonexhaustive list of

representative circumstances, as relevant in this case, includes:

> [ (1) ] Serious mental or physical disability of the Plaintiff or
> the Plaintiff's dependents which prevents employment or
> advancement; [ (2) ] The Plaintiff's obligations to care for
> dependents . . . [ (7) ] Maximized income potential in the
> chosen educational field, and no other more lucrative job
> skills . . .  [ (8) ] Limited number of years remaining in [the
> Plaintiff's] work life to allow payment of the loan; [ (9) ] Age
> or other factors that prevent retraining or relocation as a
> means for payment of the loan; [ (10) ] Lack of assets, whether
> or not exempt, which could be used to pay the loan; [ (11) ]
> Potentially increasing expenses that outweigh any potential
> appreciation in the value of the Plaintiff's assets and/or likely
> increases in the Plaintiff's income . . .

*Id.* at 947.  The additional circumstances offered by a debtor to justify

discharge of an educational loan are not limited to current events and

facts, but may also include those that existed at the time the debtor

obtained the educational loans in question.  *Mason*, 464 F.3d at 883-84.

MEMORANDUM OF DECISION – 62

The additional circumstances test focuses upon objective factors when trying to predict a debtor's future income. *Nys*, 446 F.3d at 945. The debtor "does not have a separate burden to prove them beyond the inability to pay presently or in the future which would justify complete or partial discharge." *Id.* Thus, "the circumstances need be 'exceptional' only in the sense that they demonstrate insurmountable barriers to the [plaintiff's] financial recovery and ability to pay." *Id.* at 946. This requirement prevents debtors from purposely choosing to "live a lifestyle that prevents her from repaying her student loans." *Id.* In other words, to discharge a student loan, the debtor can not have had a reasonable opportunity to improve her financial situation, and chosen not to do so. *Id.* At the same time, the Court should not fault Plaintiff "for having made reasonable choices that now inhibit her ability to substantially increase her income in the future." *Id.*

Plaintiff argues that her health problems, which she alleges currently contributes to her inability to pay her student loans, will be life-

MEMORANDUM OF DECISION – 63

long issues and will in the future prevent her from ever being able to repay her student loans.  Pl.'s Posttrial Reply Br. at 1-2, Doc. No. 98.  Put another way, because of her health issues, Plaintiff argues that her marginal financial situation will continue to deteriorate and her income will likely erode.  *Id.* at 2.

In response, ECMC argues that Plaintiff's medical concerns are not as serious as she claims.  As evidence, it points to Plaintiff's demonstrated ability to participate in a large variety of physical activities outside of work, namely the trip to South America.  *Id.* at 17-18.  ECMC also attempts to discount Dr. Cook's and Dr. Wheeler's medical opinions for various reasons and claims that Dr. Simon's diagnosis, limited to obesity, is the correct one.  *Id.* at 16-17.  ECMC further urges that, even should Plaintiff's health concerns continue, her earnings potential remains quite high, such that her income should be enough to cover Plaintiff's anticipated expenses and pay her loans, were Plaintiff to act more fiscally responsible.  *Id.* at 5-12.

MEMORANDUM OF DECISION – 64

Obviously, here, the most salient issue bearing on "additional circumstances" is the status of Plaintiff's health and its impact on her ability to earn income and limit necessary expenses in the future. To the Court, a decision about Plaintiff's health is challenging because her physicians are still in the process of determining a proper diagnosis and treatment. This analysis is further complicated by the disagreement evident in the opinions of the medical professionals.

While the proof is conflicting, assigning appropriate weight to the opinions offered by the experts leads the Court to find that Plaintiff's medical issues are indeed serious and likely of a permanent nature. Because of that, Plaintiff's medical and other expenses are likely to remain elevated, and her earnings capacity will likely remain limited. In the *Brunner* vernacular, Plaintiff's present inability to pay her student loans will likely persist through a substantial portion of the student loan repayment period. In sum, the Court concludes that the "additional circumstances" requirement under *Brunner* has been satisfied in this case.

MEMORANDUM OF DECISION – 65

Multiple doctors have noted Plaintiff's various symptoms over a period of years, including those testifying before the Court.  However, these professionals could not agree as to the specific cause or nature of Plaintiff's illnesses, nor was there any consensus about how to treat her. Even so, both Plaintiff's primary physician, Dr. Wheeler, and Dr. Cook seem to agree that her current health concerns are potentially debilitating and will cause longstanding problems for her.  They did not agree on a precise diagnosis, but they agreed that Plaintiff has thyroid dysfunction. Moreover, they agreed as to other diagnoses, such as anxiety, depression, migraines, and thyroid dysfunction, that seem to be of a permanent nature, and debilitating in and of themselves.

The Court carefully considered the testimony and opinions of  Dr. Simon.  On balance, though, the Court is reluctant to rely upon his evaluation of Plaintiff.  In comparison to the other physicians, he devoted little time to talking with or examining Plaintiff, or to analyzing Plaintiff's condition.  His examination was cursory, his report was unpersuasive, and

MEMORANDUM OF DECISION – 66

his conclusions seemed inadequately supported.  At bottom, his

conclusion that little is wrong with Plaintiff, and that if something is, it's

easily treatable, stands in stark contrast to the other medical evidence, and

is in direct conflict with the opinions of the two other medical

professionals.  All things considered, the Court respectfully declines to

assign substantial weight to Dr. Simon's opinions.

 Moreover, while ECMC notes that other tribunals may have found

Dr. Cook to have been an advocate for plaintiffs in the past,[34] the Court

finds, if that is so, it is of little moment here.  Though his opinions

generally support Plaintiff's position, Dr. Cook's report readily disagreed

_____

 [34] Dr. Cook testified that he was aware of one case where a social security
report contained comments to this effect.  Counsel for ECMC also cited *Thomas
"Keith" Austin*, IC 2011-006851, 2015 WL 1266138 (Idaho Ind. Com. Feb. 26, 2015),
where the Idaho Industrial Commission stated that:

> "Dr. Cook's opinion is given less weight than the opinions of Drs.
> Sant and Frizzell because Dr. Cook clearly went out of his way to
> advocate for Claimant.  Recall, Dr. Cook utilized the edition of the
> Guides that produced the highest level of partial permanent
> impairment even though he generally used the 6th edition."

*Id.* at 12.

MEMORANDUM OF DECISION – 67

with and dismissed certain diagnoses that may have benefitted Plaintiff.

Instead, his report provided ample support for the conclusions he reached,

and recommended consultation with a more qualified professional for

those determinations he felt he could not make.

As for Ms. Collins' report, the Court finds its conclusions of little

value since they are premised on the assumption that nothing currently

restricts Plaintiff's ability to work because her complaints are subjective

and yet to be confirmed by a professional's diagnosis.  This assumption

misses the point: while it is correct there is a disagreement as to Plaintiff's

correct diagnosis, some of the experts support Plaintiff's account of her

symptoms and have diagnosed the existence of legitimate medical

problems which inhibit Plaintiff's ability to function at work.

Furthermore, Collins' suggestion that Plaintiff may work full-time

not as a social worker, but in a different capacity, or in another field,

would likely not improve Plaintiff's financial problems.  Even were

Plaintiff working 40 hours per week, but at the reduced pay attendant to

MEMORANDUM OF DECISION – 68

some of those suggested positions, she would still not earn enough to cover her reasonable expenses. In any event, the Court is not persuaded that Plaintiff is physically able to work full-time in some other capacity, as was evidenced when her symptoms did not improve when she took on a less burdensome job and reduced her hours.

As for ECMC's suggestion that the lack of a reliable diagnosis in this case resulted from Plaintiff's efforts to "doctor shop," the Court disagrees. While it is true that Plaintiff has consulted with several medical professionals to deal with her health issues, those who have attended to her have struggled to address Plaintiff's debilitating symptoms. To the Court, her failure to achieve relief is a rational explanation for Plaintiff's multiple attempts to locate suitable treatment.

Besides Plaintiff's medical problems, there are other circumstances existing that suggest her financial problems will persist long term. At 43 years old, Plaintiff is well into her working career. Her son will be financially dependent upon her for at least three more years, and she has

MEMORANDUM OF DECISION – 69

few assets to her name.  Plaintiff's expenses are likely to increase.  Her

housing costs will probably escalate when the house she lives in is sold.

While she may pay off her car in a year, given its tired condition, the need

for a newer vehicle looms large.  Simply put, by any measure, Plaintiff's

financial future is not bright.

For all these reasons, the Court finds that, in this case, the

"additional circumstances" exist in this case of the type contemplated

under *Brunner* exist making it more likely than not that Plaintiff's inability

to repay her student loans will persist through a substantial portion of the

repayment period.

### 3.   Good Faith

The final prong of the *Brunner* test requires Plaintiff to show that she

made good faith efforts to repay the loans, or to show that the forces

preventing repayment are truly beyond her control.  *Brunner*, 46 B.R. at

756.  This prong is intended to forestall debtors from abusing the

bankruptcy system by filing a case primarily to avoid payment of student

MEMORANDUM OF DECISION – 70

loan debts.  *Pena*, 155 F.3d 1111.

"Good faith is measured by the Plaintiff's efforts to obtain

employment, maximize income, and minimize expenses."  *Roth*, 490 B.R. at

917 (quoting *Mason*, 464 F.3d at 884 (internal quotations omitted)).  The

BAP has assembled the following list of factors courts have considered in

making a good faith determination:

> 1) whether the Plaintiff has made any payments on the loan
> prior to filing for discharge, "although a history of making or
> not making payments is, by itself, not dispositive[,]" 2)
> whether the Plaintiff has sought deferments or forebearances,
> 3) the timing of the Plaintiff's attempt to have the loan
> discharged, and 4) whether the Plaintiff's financial condition
> resulted from factors beyond her reasonable control, as a
> Plaintiff may not willfully or negligently cause her own
> default.

*Roth*, 490 B.R. at 917 (citations omitted).

While also not dispositive, another important "good faith" factor

focuses upon the debtor's efforts to negotiate a repayment plan.  *Id.* (citing

*Pa. Higher Educ. Assistance Agency v. Birrane (In re Birrane)*, 287 B.R. 490, 499

(9th Cir. BAP 2002) and *Jorgensen*, 479 B.R. at 89, n. 4.  In considering such

MEMORANDUM OF DECISION – 71

efforts, the terms, duration, and consequences, such as future tax liability

and negative credit ratings, need to be considered. *Roth*, 490 B.R. at 917

(citing *Carduff*, 367 B.R. at 136-137).[35]

Plaintiff argues that she has acted in good faith in this case by trying

to maximize, or at least to maintain her income, as well as by endeavoring

to minimize her expenses. Pl.'s Posttrial Reply Br. at 3, Dkt. No. 98.

ECMC strongly disagrees, arguing that many of Plaintiff's financial

decisions, and much about her current financial situation, evidence a lack

of good faith. ECMC's Posttrial Br. at 20, Dkt. No. 94.

Since graduating in 2006, Plaintiff has maintained employment and

sought to maximize her income by working in increasingly responsible

positions within the field in which she was educated and trained to work.

Initially, she worked full-time and steadily increased her salary for several

years. Plaintiff did not experience a decrease in pay until recently, which

---

[35] Whether a debtor has exhibited good faith under *Brunner* is a question
of fact, and a bankruptcy court's findings are reviewed for clear error. *Hedlund
v. Educ. Res. Inst. Inc.*, 718 F.3d 848, 854 (9th Cir. 2013).

MEMORANDUM OF DECISION – 72

the Court finds to primarily be the result of the serious health problems

Plaintiff has developed, which required her to, among other things,

pursue more amenable working conditions.

Plaintiff's expenses are, for the most part, unremarkable and

modest, and she has generally attempted to keep them low, largely out of

necessity, given her limited income.   Indeed, her current expenses are

extremely low given the financial demands associated with raising a child.

This is not to say that Plaintiff has not made mistakes in managing

her finances, both discrete and chronic, and ECMC is justified in criticizing

some of Plaintiff's decisions.  For example, Plaintiff's decision while

deeply in debt to purchase a motorcycle with her husband on credit, and

after divorce, to retain it and make payments on the loan, is difficult to

understand.  Her decision to borrow and spend thousands for a trip to

South American for "training" for an photography occupation that, had

she researched it beforehand, would have shown would pay her an

inadequate income, was, frankly, foolish.   Plaintiff's continuing practices

MEMORANDUM OF DECISION – 73

of relying on credit cards and overdrafted checks to live and pay her bills

is also clearly problematical and unwise.  Her willingness to finance her

adult daughter's expenses is commendable, but represents a choice

Plaintiff should have declined given the amounts she owes to her

creditors.  And, Plaintiff's purchase of an expensive cell phone for her

teenage son on her constricted budget demonstrates a lack of financial

discipline.

On the other hand, Plaintiff did not seek to discharge her student

loans shortly after they first became due, or when she was first required to

seek bankruptcy relief.  While it is true that, over the years, Plaintiff has

made few payments totaling insignificant amounts towards retirement of

the student loans, during most of the repayment period, Plaintiff had

requested and was granted forbearance by the lender due to her financial

difficulties.  Moreover, Plaintiff twice attempted, albeit unsuccessfully, to

repay her loans through IBR plans, and she sought repayment assistance

through NHSC.  Plaintiff did not seek to discharge her loans until her

MEMORANDUM OF DECISION – 74

health problems escalated, causing her to move to a lower paying job while facing increasing expenses.  By that time, her loan balance had ballooned to such a balance that it would have been improbable for her to make payments sufficient to ever pay off her loans.  At this point in time, Plaintiff is not paying her student loans, not because she can do so but chooses not to, but because she simply lacks the economic ability to do so.

In sum, all things considered, the Court concludes that Plaintiff has demonstrated the requisite good faith to discharge the bulk of her student loans under the *Brunner* test.  She has attempted to earn a good income while living modestly.  While her financial decisions have not been perfect, even had she not erred in her spending decisions, she would have nonetheless been unable to make any substantial student loans payments while meeting her normal living expenses.  In other words, to the extent that Plaintiff made bad judgments about motorcycles, trips, cell phones and kids, her decisions, at bottom, were largely inconsequential in relation to whether she could have paid her student loans.  As a result, that she

MEMORANDUM OF DECISION – 75

occasionally made bad financial choices should not disqualify her from

securing relief.

Moreover, the Code accommodates situations like this one. The

discharge of student loans is not an all or nothing proposition. *See Saxman*

*v. Educ. Credit Mgmt. Corp. (In re Saxman)*, 325 F.3d 1168, 1173 (9th Cir.

2003). "Bankruptcy courts may exercise their equitable authority under

§ 105(a) to partially discharge student loans." *Jorgensen*, 479 B.R. at 86

(citing *Saxman*, 325 F.3d at 1173). In doing so, bankruptcy courts have

discretion in determining the amount and terms of payment of a partial

discharge. *Bossardet v. Educ. Credit Mgmt. Corp. (In re Bossardet)*, 336 B.R.

451, 457 (Bankr. D. Ariz. 2005). "However, a bankruptcy court's discretion

to grant a partial discharge is not unlimited. In each case, the bankruptcy

court must find that all three prongs of the *Brunner* test were satisfied as to

the portion of debt discharged." *Jorgensen*, 479 B.R. at 86. And, the debtor

still bears the burden of establishing undue hardship as to any portion of

the debt to be discharged. *Carnduff*, 367 B.R. at 133.

MEMORANDUM OF DECISION – 76

In this case, in the exercise of its discretion, the Court concludes that, under *Brunner*, Plaintiff is entitled to a discharge of the bulk of the balance due on the ECMC student loans because she can not repay them without undue hardship. By entry of a partial discharge, the Court can, in an equitable fashion, both grant Plaintiff the relief she truly needs, while recognizing that, in the past, Plaintiff may have deprived the lender of a modest amount of funds Plaintiff may have "misspent" under the circumstances.

Presumably recognizing the Court's authority to grant a partial discharge, and the propriety of such remedy under these facts, after trial, ECMC offered to agree to the entry of a partial discharge to reduce Plaintiff's remaining student loan balance to $60,000. ECMC's Posttrial Br. at 22-23. However, ECMC claims that if this course is taken, to allow Plaintiff to maintain eligibility for the various income-driven repayment plans, the contract interest rate must remain the same and no particular payment terms can be set. *Id.* at 23. While it is significant that ECMC

MEMORANDUM OF DECISION – 77

apparently realizes that Plaintiff can not repay the full balance due on her

student loans, it offered little to support of the specific amount to be

excepted from discharge, and under the evidence, the Court finds ECMC's

proposal to be excessive.[36]

Instead, the Court is guided in its decision by case law. For

example, in *Jorgensen*, the bankruptcy court declined to  discharge the

debtor's student loans for the amount of payments she had made on a car

she purchased before traveling abroad for five and a half months, during

which time she had no need for the vehicle. 470 B.R. at 86-87.  On appeal,

the BAP concluded that the bankruptcy court had appropriately exercised

its discretion. *Id.*  Concerning the *Brunner* good faith analysis, the panel

stated:

> [Debtor's] decision to purchase a car before she went to Paris .
> . . weigh[s] against a finding of good faith.  To be clear, [her]
> purchase of a new car was not improper . . . however, [it] was
> imprudent.  As a result, she incurred several thousand dollars of

---

[36]  While repayment plans tied to Plaintiff's income are undoubtedly more
realistic, if she were required to repay $60,000 over 15 years with seven percent
interest, her monthly payment would be almost $540.

MEMORANDUM OF DECISION – 78

> a car payment expense without using the vehicle. The
> bankruptcy court properly accounted for her error by finding
> that the extraneous expense could not be discharged.

*Id.* at 89.

Here, where Plaintiff has made several imprudent decisions that were not necessary to maintain a minimal standard of living, and weigh against a finding of good faith, the Court finds it appropriate to nonetheless grant her a partial discharge of the bulk of her student loan debt. Under the facts, the Court concludes that Plaintiff's lack of financial discipline may have consumed $10,000 that would otherwise have been available to pay on her loans. She will not be allowed to discharge that amount of the ECMC debt, but all balances due on the student loans in excess of that sum will be discharged. Contract interest will continue to accrue on that sum, and any of repayment terms will be left to Plaintiff and ECMC to negociate. To the Court, this resolution adequately recognizes Plaintiff's genuine need for relief from her student loan debt, while protecting ECMC from Plaintiff's occasional imprudence in

MEMORANDUM OF DECISION – 79

managing her finances.

//

### Conclusion

Under § 523(a)(8) and the applicable case law, Plaintiff has shown

she can not repay the full balance due on the ECMC student loan debt

without an undue hardship.  Based upon the facts and equities, the Court

concludes that a partial discharge of that debt should be entered.

Accordingly, for the explained above, and based upon the facts and

equities, all amounts owed by Plaintiff on the ECMC loan in excess of

$10,000 will be excepted from discharge.

Counsel for parties shall submit an approved form of judgment for

entry by the Court.

Dated:  May 3, 2016

Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION – 80

MEMORANDUM OF DECISION – 81